UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **ZAID YALDA,** <br><br>        Plaintiff, <br><br> vs. <br><br> **REPUBLIC NATIONAL DISTRIBUTING COMPANY,** <br><br>        Defendant. | **2-23-CV-12638-TGB-KGA** <br><br> HON. TERRENCE G. BERG <br><br> **ORDER GRANTING REPUBLIC NATIONAL DISTRIBUTING COMPANY'S MOTION FOR SUMMARY JUDGMENT** <br><br> **(ECF NO. 10)** |

Zaid Yalda was a liquor salesperson for Republic National Distributing Company ("RNDC"). RNDC effectively terminated Yalda's employment after Yalda tore his meniscus and ACL. Because these injuries restricted Yalda from being able to perform his essential job functions, no reasonable jury could find that Yalda could do his job, whether with or without a reasonable accommodation. On such a record, RNDC's Motion for Summary Judgment must be **GRANTED**, and this case will be **DISMISSED**.

## I. FACTS

### A.   Yalda's Job

From 2017 to 2022, Yalda worked for RNDC as a Control States Sales Representative – a liquor salesperson. ECF No. 10, PageID.74, PageID.80; ECF No. 10-3, PageID.38. Yalda's sales route had two

hundred and fifty accounts, and was one of the most profitable in the company. *Id.* at PageID.79. Yalda earned his position as a liquor salesperson after receiving multiple promotions. ECF No. 11-2, PageID.252.

Yalda described his average day as a liquor salesperson as follows:

> So my job title is to wake up in the morning . . . **go to my accounts, service the accounts [to] see what they are missing on the shelf.** Open my book iPad, show them what was the new products, what we have in there, what we could expand on product on the shelf, take the orders, submit it, and the company will deliver it.

*Id.* at PageID.254 (emphasis added). Yalda did these tasks while making in-person visits to his customers' premises. *Id.*

Yalda's job required other physical tasks as well. On sales visits to stores, he would assist the customer with stocking shelves and building product displays. *Id.* at PageID.255-56. Yalda's understanding of the physical requirements of his liquor salesperson role matched the written requirements of his official job description. In a section titled "Physical Demands," Yalda's official job requirements stated that:

> While performing the duties of his job, the employee is frequently required to stand; walk . . . stoop; kneel; crouch or crawl . . . . The employee must regularly lift and, slash, or move up to 30 pounds . . . .

*Id.* at PageID.256. When asked in his deposition whether those were the physical demands associated with his job, Yalda responded: "Sure." *Id.*

Waseem Jarbou, a RNDC employee who used to be an RNDC sales representative, agreed: he testified that sales representatives performed physical activities while merchandising, including moving product and setting up displays on every account call. ECF No. 10-8, PageID.160. Yalda also reported that RNDC had six or seven "merchandisers" who would also set up product displays. ECF No. 11-2, PageID.255.

Yalda's supervisor, Mike Cavin, testified that RNDC liquor salespeople "have a route that's assigned to them, and they call on those accounts directly because we believe that . . . direct person-to-person contact is the best way to grow the business." ECF No. 10, PageID.75; ECF No. 10-10, PageID.166-67. While it would be possible to sell liquor by email or over the phone, Cavin had nobody in his department who did direct telephone sales, as distinct from the in-person salesperson role. ECF No. 10-10, PageID.166-67, PageID.169. Although not part of Cavin's department, an RNDC employee in Atlanta did conduct some telephone sales for Cavin. *Id.* But that employee's role was different from Yalda's salesperson role: it only involved taking and processing orders from smaller volume accounts, not physically visiting large customers and selling to them. *Id.*

### B.    Yalda's Injury, Restrictions, and RNDC Responses

In November 2021, Yalda tore his meniscus and ACL. ECF No. 11-2, PageID.258. He underwent reconstructive surgery on November 16, 2021. *Id.* at PageID.259. Around that time, Yalda gave Cavin the first of

what would be several doctor's notes. *Id.* The note stated that Yalda needed to be off work from November 16, 2021, through approximately November 24, 2021, because of Yalda's right knee ACL reconstruction. ECF No. 10-4, PageID.144.

Yalda then submitted another doctor's note, dated November 24, 2021, stating that he could return to work on that date with a restriction of "seated work only." ECF No. 10, PageID.76. The note did not state for how long this restriction would continue, but provided that Yalda would be re-assessed at a future follow-up appointment. *Id.*

RNDC informed Yalda that they could not accommodate his "seated work only" restriction. *Id.* at PageID.77. They placed Yalda on medical leave effective November 24, 2021. *Id.* Mike Cavin testified that RNDC was unable to accommodate Yalda's request, because Cavin did not "have an extra person to go replace the actual physical labor part of [Yalda's] assignment." ECF No. 10-10, PageID.174. Neither did Cavin have an available "office job" for someone to do telephone sales, as that role was outsourced to Atlanta. *Id.* at PageID.169. Yalda testifies that while he was on medical leave, he still responded to client emails and made sales. ECF No. 11, PageID.220.

Yalda submitted a new doctor's note dated January 5, 2022. ECF No. 10, PageID.77. The note stated that Yalda still required a "seated work only" restriction until February 18, 2022. *Id.* Yalda remained on medical leave and did not return to work, although he testifies that he

4

still responded to client emails and made sales. ECF No. 10, PageID.78; ECF No. 11, PageID.220.

Mike Cavin testified that from the time of Yalda's knee surgery in November 2021, until February 2022, RNDC did not have any other salesperson take over Yalda's route. ECF No. 10-10, PageID.168. This situation hurt RNDC's sales:

> October, November and December we deliver 42 percent of what we sell for the year . . . it creates quite a hardship to not have anybody representing you in that time. . . . So he had one of the largest and most profitable routes in the company and we didn't have anybody to service it.

*Id.* at PageID.171.

Yalda submitted a final doctor's note on February 16, 2022. ECF No. 10, PageID.78. It stated that from February 16, 2022, through approximately June 1, 2022, Yalda could not do any prolonged standing or walking, any kneeling or squatting, or any heavy lifting. *Id.* Yalda admitted in his deposition that his job duties included being frequently required to stand, walk, stoop, kneel, crouch, crawl and regularly lift and, slash, or move up to 30 pounds. ECF No. 11-2, PageID.256. In his deposition, Yalda first denied that he was claiming that his ACL tear prevented him from performing his essential functions as a sales representative. *Id.* at PageID.259. And at the hearing on the Motion, Yalda's attorney maintained that Yalda could perform his job's essential

5

functions. However, after Yalda was specifically asked about his job duties of kneeling and squatting, the following exchange took place:

> So [as of February 16, 2022] you could not perform some of your job's essential functions that were listed in your job description; correct?
>
> [Yalda:] Yes.

*Id.* at PageID.264.

Mike Cavin agreed. He testified that this doctor's note showed that Yalda "still wasn't able to do the job the way that the expectation of the description was." ECF No. 10-10, PageID.169. Cavin testified that holding Yalda's route open until June 2022 would have been "a major, major problem and hardship." *Id.* at PageID.175.

Following receipt of Yalda's last doctor's note, RNDC changed Yalda's employment status to "inactive," and shut off Yalda's email and access to RNDC's computer system. ECF No. 10, PageID.23. He received no more benefits from RNDC. ECF No. 11, PageID.224. RNDC and Yalda dispute whether RNDC told Yalda that his employment was terminated. ECF No. 10, PageID.80; ECF No. 11, PageID.224. RNDC claims that Yalda "unreasonably" concluded he was terminated, where Yalda's computer access was shut off and he was replaced. ECF No. 10, PageID.80. At the hearing on the Motion, RNDC's attorney maintained that Yalda could seek to return to work for RNDC in some unspecified position if Yalda could show that he was physically capable of performing the job.

**C.    Procedural History**

Yalda filed a lawsuit against RNDC in the Circuit Court for Wayne County in the State of Michigan on September 19, 2023, alleging that RNDC unlawfully discriminated against him in violation of the Michigan Persons With Disabilities Civil Rights Act ("PWDCRA") and the Americans with Disabilities Act ("ADA"). ECF No. 1-2, PageID.9, PageID.12-14. Yalda also brought two claims under the Family and Medical Leave Act, ECF No. 1-2, PageID.14-16, but later stipulated to dismiss both claims with prejudice. ECF No. 8, PageID.60.

On August 30, 2024, RNDC filed a Motion for Summary Judgment on Yalda's remaining disability discrimination claims under the PWDCRA and ADA. ECF No. 10. Yalda filed a Response on September 20, 2024, ECF No. 11, and RNDC filed a Reply on October 4, 2024. ECF No. 12. On March 11, 2025, the Court held a hearing on RNDC's Motion, at which the Court heard argument from attorneys for RNDC and for Yalda.

## II. STANDARD OF REVIEW

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013); see also Fed. R. Civ. P. 56(a). A fact is material only if it might affect the

7

outcome of the case under governing law. See *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 249 (1986).

On a motion for summary judgment, the Court must view the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted); *Redding v. St. Eward*, 241 F.3d 530, 531 (6th Cir. 2001).

The moving party has the initial burden of demonstrating an absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this burden, the party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The trial court is not required to "search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Instead, the "nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the challenged claims to the trier of fact or whether the moving party must prevail as a matter of law. *See Anderson*, 477 U.S. at 252. For the Court to grant summary

judgment, the evidence cannot be such that "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

## III. ANALYSIS

Yalda claims that RNDC unlawfully discriminated against him under the ADA and PWDCRA in two ways: RNDC failed to accommodate Yalda's disability, and RNDC unlawfully terminated Yalda's employment because of his disability. ECF No. 1-2, PageID.12-14; ECF No. 11, PageID.226, 230, 235.

To prove claims under the ADA and PWDCRA, Yalda must show that he could have performed the essential functions of his job as a liquor salesperson, with or without a reasonable accommodation. *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 761 (6th Cir. 2015); *Peden v. City of Detroit*, 470 Mich. 195, 206 (2004). As will be explained below, the record is undisputed that Yalda's severe injuries and their accompanying work restrictions made it impossible for him to carry out his job duties, and that no accommodation was possible that would have enabled him to do so. First, the physical tasks that Yalda could not do were essential: his job required him to walk around and physically assist customers to store and display their products. Second, Yalda could not do that physical work even with reasonable accommodations: any mobility aids would not have addressed Yalda's inability to bend and lift; hiring or reassigning others to help with physical labor is not a reasonable accommodation; and

9

indefinite medical leave would not have permitted Yalda to perform his job.

Because Yalda cannot prove his claims under the ADA and PWDCRA, RNDC is entitled to judgment as a matter of law.

## A.   Physical Work Was an Essential Function of Yalda's Job With RNDC

While Yalda argues that "essential functions of a job are questions of fact for the jury," ECF No. 11, PageID.217, courts routinely grant summary judgment based on their common-sense determination that a job function is essential. *See Ford Motor Co.*, 782 F.3d at 758, 761-62; *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 847-48 (6th Cir. 1998).

## 1.   There is No Factual Dispute Concerning the Definition and Scope of Yalda's Job Duties

"Essential functions generally are those that the employer's 'judgment' and 'written [job] description' prior to litigation deem essential." *Ford Motor Co.*, 782 F.3d at 761-62; *see Peden v. City of Detroit*, 470 Mich. at 218 ("[T]he judgment of the employer regarding the duties of a given job position is entitled to substantial deference.").

Here, there is no dispute regarding Yalda's job requirements. Yalda testified that RNDC's written job description of the physical demands associated with his salesperson job was accurate: the description identified his job's physical demands. ECF No. 11-2, PageID.256. Those demands included being "frequently required to stand; walk . . . stoop; kneel . . . . [and] regularly lift and, slash, or move up to 30 pounds."

10

At the hearing the Court held on the Motion, Yalda's counsel referred to Yalda's deposition testimony that merchandising was usually performed by the merchandising team. *See id.*, PageID.255-56. But this does not affect Yalda's testimony that frequently standing, walking, squatting, lifting, and kneeling "were the physical demands associated with [his] job." *Id.* at PageID.256. Additionally, Yalda's counsel argued that because Yalda's official job description stated that someone is his role "may" be responsible for merchandising, merchandising should not be considered an essential function. *See* ECF No. 10-3, PageID.138-39. First, this merchandising requirement is included in a list of "Essential Duties and Responsibilities." *Id.* at PageID.139. Carrying out merchandising was an essential duty for Yalda. Second, Yalda's job description also states that he is "required" to stand, walk, squat, lift, and kneel. *Id.* at PageID.141. And Yalda admitted that this description of his duties was accurate. ECF No. 11-2, PageID.256. There is no genuine issue of fact for the jury to resolve on whether Yalda's written job description correctly described his role's physical duties.

## 2. The Physical Requirements of Yalda's Job Were Essential to the Performance of his Duties

In determining whether a job duty is essential, courts look to the EEOC's regulations, which state that a job function may be considered essential for reasons including the amount of time spent on the job performing the function, the consequences of not requiring the employee

11

to perform that function, and the work experience of past incumbents in the job. *Ford Motor Co.*, 782 F.3d at 762, *citing* 29 C.F.R. § 1630.2(n)(3).

The record before the Court shows that Yalda regularly performed the physical functions at issue. Yalda testified that an average day of his job included him physically visiting customers at their locations. ECF No. 11-2, PageID.254. Once there, he would assist them in setting up product displays and stocking shelves. *Id.* at PageID.255-56 ("[The job duties say you may] be responsible for . . .stocking shelves, stocking cold boxes and building displays . . . . it was part of your duties; correct?" "Yes.").

These duties were essential to RNDC because, if not performed, the company would need to either reassign or hire additional personnel to perform them. If Yalda was unable to spend prolonged time walking and standing, or was unable to perform tasks that required kneeling and heavy lifting, RNDC would have had to find someone who could do those things. Mike Cavin testified that he did not "have an extra person to go replace the actual physical labor part of the assignment." ECF No. 10-10, PageID.174. Without Yalda being able to do it, Cavin would have had to assign someone to help him with those tasks during customer visits. *Id.* In his Response, Yalda argues that merchandising was the responsibility of the merchandising team. ECF No. 11, PageID.221-22. But this does not contradict Yalda's testimony that he still performed physical tasks as part of his job. ECF No. 11-2 at PageID.256. Even if other employees

performed physical tasks, those physical tasks were *also* an essential function of Yalda's job.

Moreover, Waseem Jarbou, who was a RNDC sales representative before Yalda, and therefore a past incumbent in Yalda's job, testified that RNDC sales representatives would frequently perform merchandising activities, including building displays, shelving product, and personally visiting accounts. ECF No. 10, PageID.86.

There is no genuine issue of material fact that standing, walking, kneeling, and heavy lifting were an essential part of Yalda's RNDC salesperson role because the record clearly shows: (1) Yalda regularly performed the physical functions of his job; (2) RNDC would have needed to hire or assign others to perform the physical parts of Yalda's job if he could not do it; and (3) these were the physical functions performed by past incumbents in the job.

### 3.    RNDC Salespersons Physically Assisted Customers

"A job function is essential if its removal would fundamentally alter the position." *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018), *quoting Kiphart v. Saturn Corp.*, 251 F.3d 573, 584 (6th Cir. 2001).

Yalda argues that "it is easy to dismiss kneeling, bending, and heavy lifting as essential functions of [Yalda's] job [because] Yalda was a salesperson . . . ." ECF No. 11, PageID.228-30. In effect, Yalda relies on the *concept* of what a salesperson is and does: because their "true" role is

13

making sales, anything apart from making sales cannot be an "essential function" of their job. That elevates form over function, when function is what matters. *See Koss v. Lincare, Inc.*, No. 11-11932, 2012 WL 1843031, at *10 (E.D. Mich. May 21, 2012) (Ludington, J.) (finding that physical work duties were essential, over a former sales representative's objection that the only "essential function is, as the job title suggests, selling.").

While Yalda's job title with RNDC was "salesperson," the evidence demonstrates that RNDC salespeople are expected to perform the physical tasks at issue—walking, standing, kneeling, lifting—as a regular part of that job. Removing those physical tasks would have fundamentally altered Yalda's role, in fact, by transforming it into a "pure sales" role, rather than one where the RNDC salesperson physically shows up at customer locations and actively engages by helping them move products or set up displays. Because removing those duties would have fundamentally altered Yalda's position as defined, they were essential functions of Yalda's job. The available evidence would not permit a reasonable jury to find otherwise.

This is because Yalda has produced no evidence to refute RNDC's evidence, and his own testimony, showing that prolonged standing and walking, and kneeling and heavy lifting, were essential functions of his job as a liquor salesperson for RNDC. Indeed, both parties have produced evidence showing that those functions were an everyday part of Yalda's required job and were clearly set out in Yalda's job description. And

14

RNDC has adduced unrefuted evidence showing that Yalda's inability to perform those functions would have imposed negative consequences on RNDC. Therefore, RNDC is entitled to summary judgment that those physical tasks were essential functions of Yalda's job.

### B. Whether Yalda Could Perform Essential Functions of his Job, With or Without Reasonable Accommodation

On February 16, 2022, Yalda submitted a doctor's note stating that from February 16, 2022, through approximately June 1, 2022, Yalda could not do work with prolonged standing or walking, any kneeling or squatting, or any heavy lifting. ECF No. 10, PageID.78. This meant that Yalda could not perform essential functions of his job without accommodation.

> So [as of February 16, 2022] you could not perform some of your job's essential functions that were listed in your job description; correct?
>
> [Yalda:] Yes.

ECF No. 11-2, PageID.264.

Accordingly, for Yalda to recover under the ADA or PWDCRA, he must have been able to perform the essential functions of his job with a reasonable accommodation. *Ford Motor Co.*, 782 F.3d at 761; *Peden*, 470 Mich. at 206. The Court has considered several potential accommodations, including Yalda's proposed accommodation of the RNDC merchandising team assisting Yalda with his physical tasks. ECF

No. 11, PageID.235. But no reasonable accommodation would have allowed Yalda to perform the essential functions of his job.

### 1. Mobility Aids

Yalda did not argue to RNDC or to this Court that he could have performed the essential functions of his job as a liquor salesperson by using a wheelchair or another mobility aid like a knee scooter. Instead, Yalda argues that RNDC should have accommodated his injuries by "having the merchandising team pick up the slack" and "relieve [Yalda] from assisting [customers] in setting up displays and clearing shelves." ECF No. 11, PageID.235, PageID.231. It is Yalda's duty as the nonmovant to direct the Court's attention to evidence that creates a genuine issue of material fact. *In re Morris*, 260 F.3d at 655. But even if Yalda had raised the mobility aid argument, it would not change the outcome.

Using a wheelchair or a knee scooter could have allowed Yalda to visit with customers and travel around their stores, which were essential functions. However, Yalda still would not have been able to kneel, squat, or lift heavy objects, tasks which were also essential functions of his job. Because he could not have fulfilled those essential functions, the mobility aids suggested above would not have been reasonable accommodations.

### 2. Shifting Physical Work to Others

Under the ADA, a reasonable accommodation "does *not* include removing an essential function from the position, for that is per se

unreasonable." *Ford Motor Co.*, 782 F.3d at 761 (emphasis in original, internal quotation marks removed), *quoting Brickers* 145 F.3d at 850. Employers need not reallocate essential functions of a job to other employees to accommodate a disability. *Bratten v. SSI Servs., Inc.*, 185 F.3d 625, 632 (6th Cir. 1999); *cf. Rorrer v. City of Stow*, 743 F.3d 1025, 1044 (6th Cir. 2014) ("Shifting marginal duties to other employees who can easily perform them is a reasonable accommodation."). Similarly, under the PWDCRA, employers have "no duty to . . . adjus[t] or modif[y] job duties otherwise required by the job description." *Kerns v. Dura Mech. Components, Inc.*, 242 Mich. App. 1, 16 (2000).

As stated, Yalda proposes the accommodation of directing members of RNDC's merchandising team travel with him to customer locations and "relieve [Yalda] from assisting them in setting up displays and clearing shelves." ECF No. 11, PageID.232. But doing so would mean reallocating essential functions of his job to other employees. Such an action is *per se* not a reasonable accommodation. *See Ford Motor Co.*, 782 F.3d at 761. It is apparent from Yalda's testimony and the testimony of his supervisors that even if there were other RNDC employees who helped customers handle product and displays, doing so was still an essential element of Yalda's own job. They were not "marginal duties," because Yalda performed them regularly and understood them to be essential job functions. ECF No. 11-2, PageID.264

Moreover, even if the physical duties of Yalda's job were "marginal," Mike Cavin testified that RNDC did not have "an extra person to go replace the actual physical labor part of [Yalda's] assignment," as would be required for the "merchandiser" accommodation to work. ECF No. 10-10, PageID.174. Because Yalda's job involved daily travel to customer locations, this accommodation would require giving Yalda, in effect, a traveling assistant. Yalda has not provided evidence to create a genuine dispute of material fact in opposition to Cavin's testimony that RNDC was unable to allocate Yalda's responsibilities to another employee. Accordingly, that proposed accommodation would have been unreasonable.

Similarly, if Yalda had proposed his transfer to a role in which he could make sales from the office alone, Cavin testified that he did not have anyone who performed that role in the RNDC office: it was outsourced to someone in Atlanta. *Id.* at PageID.169. Such a transfer was unavailable, and this hypothetical accommodation would not have been reasonable: the ADA does not require employers to create new positions to accommodate employees who may become disabled. *Henschel v. Clare Cnty. Rd. Comm'n*, 737 F.3d 1017, 1025 (6th Cir. 2013); *Kerns*, 242 Mich. App. at 16.

### 3.  **Indefinite Leave**

While Yalda did not suggest its applicability in his Response, medical leave can be a reasonable accommodation for a disability.

18

*Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 394 (6th Cir. 2017), *citing Cehrs v. Ne. Ohio Alzheimer's Research Ctr.* 155 F.3d 775, 783 (6th Cir. 1998). But an employer is not required to keep an employee's job open indefinitely. *Williams*, 847 F.3d at 394. Rather, even with a physician's estimate of a return date, "additional leave is an objectively unreasonable accommodation where an employee has already received significant amounts of leave and has demonstrated 'no clear prospects for recovery.'" *Williams*, 847 F.3d at 934, *quoting Walsh v. United Parcel Serv.*, 201 F.3d 718, 727 (6th Cir. 2000); *and citing Maat v. County of Ottawa*, 657 Fed. Appx. 404, 412-13 (6th Cir. 2016).

Here, long-term medical leave would not have been a reasonable accommodation. At a minimum, it would have required granting Yalda leave from February 16, 2022, to June 1, 2022. ECF No. 10, PageID.78. This is because the note stated that the restrictions which made Yalda unable to perform essential functions of his job would continue until "approximately" June 1, 2022. *Id.* Yalda had already been away from work from November 16, 2021, to February 16, 2022: three months during RNDC's busy season. ECF No. 10-10, PageID.171.

Yalda had demonstrated no clear prospects of recovery during those three months: his work restrictions improved from "seated work only," ECF No. 10, PageID.76, to "no prolonged standing or walking," *id.* at PageID.78, but prolonged standing and walking were essential functions of his job, and he remained unable to lift heavy objects or kneel and squat.

19

*Id.* This left him admittedly unable to fulfill essential functions of his salesperson role. ECF No. 11-2, PageID.264. Yalda's lack of progress meant that he had not shown that additional leave would have improved his condition. *See Williams*, 847 F.3d at 934.

If Yalda had been absent from February 16, 2022, to June 1, 2022, he would not have performed the essential physical functions of his job for nearly seven months. Mike Cavin testified that Yalda's absence during this time would have been a "major, major problem and hardship" for RNDC. ECF No. 10-11, PageID.175. Yalda argues that he *was* able to perform the essential functions of his job, because he made sales while he was on leave. ECF No. 11, PageID.218. But he was unable to physically provide service to customers. ECF No. 11-2, PageID.264. And that was an essential function of his job. Yalda's absence risked causing losses to RNDC, as Yalda was unable to visit customers, sell to them, and physically assist them. ECF No. 10-10, PageID.171-72.

Under the circumstances, there is no genuine issue of material fact that four more months of medical leave, with no clear prospect of recovery, would not have been a reasonable accommodation. RNDC was not required to keep Yalda's job open indefinitely, which would have been the net effect of granting Yalda four more months of leave.

### C. Was There A Lack of Interactive Process

Yalda points out that an employer violates the ADA by failing to engage in an interactive process with a disabled employee who requests

an accommodation. ECF No. 11, PageID.232, *citing Mosby-Meachem*, 883 F.3d at 605-06. But in the Sixth Circuit, failure to engage in the interactive process "is a violation of the ADA only if the plaintiff establishes a prima facie case of failure to accommodate." *Thompson v. Fresh Prods.*, LLC, 985 F.3d 509, 525 (6th Cir. 2021). And as stated, to establish a prima facie case of failure to accommodate, a plaintiff must be a "qualified" person under the ADA who can perform the essential functions of their job with reasonable accommodations. *Ford Motor Co.*, 782 F.3d at 761; *see Saroki-Keller v. Univ. of Michigan*, 568 F. Supp. 3d 860, 870 (E.D. Mich. 2021) ("Because the Court finds that Saroki-Keller is not otherwise qualified . . . her failure-to-engage-in-the-interactive-process claim must also be dismissed . . . . no reasonable accommodation exists for the University to identify.").

Yalda's injuries meant that he was not a "qualified person" under the ADA: he could not perform the essential physical responsibilities of his liquor salesperson job with RNDC, with or without reasonable accommodations. As such, he cannot prove a claim for failure to accommodate, or failure to engage in the interactive process.

## IV. CONCLUSION

Before his injury, Zaid Yalda was an excellent salesperson for Republic National Distributing Company. He earned successive promotions and was entrusted with significant responsibilities. Unfortunately, Yalda's injuries to his ACL and meniscus, and the long

recovery process that he required, prevented him from fulfilling those responsibilities and essential duties, as he otherwise surely would have. Although RNDC is entitled to judgment as a matter of law on Yalda's disability discrimination claims, that does not minimize the fact that RNDC's decision to effectively terminate Yalda's employment—whether referred to as "permanent inactive status" or by some other euphemism—ended the career of a good employee. While his situation is unfortunate, it is not one that violates the law. At the hearing, RNDC maintained that, because he was never actually fired, Yalda was eligible to try to return to work if he were able to perform the job. If true, and if Yalda wishes to return, it is hoped that he can do so. But as to this case, RNDC's Motion for Summary Judgment is **GRANTED**.

      **SO ORDERED.**

Dated: March 17, 2025      /s/Terrence G. Berg
                                   HON. TERRENCE G. BERG
                                   UNITED STATES DISTRICT JUDGE